In the Matter of LEHIGH VALLEY RAIL-ROAD COMPANY, Debtor.

In re REHABILITATION OF OWEGO-MORAVIA AND CORTLAND BRANCH LINES.

No. 70–432.

United States District Court, E. D. Pennsylvania.

Nov. 19, 1974.

Duane, Morris & Heckscher, by Robert L. Pratter, Philadelphia, Pa., for the trustee, Lehigh Valley Railroad Co.

Ballard, Spahr, Andrews & Ingersoll by Richard L. Sherman, Philadelphia, Pa., and Bruce Wasserstein, New York City, for the indenture trustees.

John C. McTiernan, Albany, N. Y., for the New York State Dept. of Transp.

James F. Dausch, Dept. of Justice, for the United States.

## MEMORANDUM AND ORDER NO. 288

FULLAM, District Judge.

The Trustee of the Debtor has filed a petition (Document No. 1297) seeking approval of an arrangement pursuant to which the State of New York, through its Department of Transportation (NYDOT) will bear the full cost (not to exceed $850,000) of upgrading two of the Debtor's branch lines so that they may be restored to service. The two lines are: a 49.1-mile segment between Owego and Moravia, New York, and a 14-mile segment between Cortland and Etna, New York. If approved, the agreement would require the Debtor to continue to provide rail service over the lines for eight years, subject to certain conditions discussed below.

Both branch lines are the subjects of pending abandonment proceedings. Although both abandonments are being contested, it appears that traffic density over the lines in the past few years has fallen below the 34 cars per mile per year level, giving rise to a presumption, established by the ICC, that operations over the lines cannot be conducted profitably. Notwithstanding this presumption, all parties in the present proceeding appear to recognize that the evidence presented to the ICC in the abandonment proceedings is in conflict on the issue of profitability, and that the likelihood of a prompt and favorable resolution of the abandonment proceedings is not great.

Because the condition of the two lines no longer met the minimum Class 1 standard prescribed by the Federal Rail Administration for operation over the lines, the Trustee, in September 1974, was forced to embargo all service over the lines. Although some of the required upgrading has now been performed, service to the principal shipper on the lines has not yet been restored, because of the hazardous nature of the traffic (liquid propane).

Thus, the circumstances underlying this petition present, in acute form, the vexing problems affecting many, perhaps most, of the branch lines of the Debtor.

The service is needed by the public. On the basis of fully allocated costs, the lines can only be operated at a loss.

If only above-the-rail costs are considered, projections can be made which approach the break-even point, or even demonstrate marginal profitability. Unless substantial capital improvements are made, it is impossible to conduct rail operations over the lines. The Debtor lacks the cash to make the necessary improvements. The Debtor has not been relieved of its common carrier responsibilities with respect to the lines, and normal abandonment proceedings hold no prospect of prompt relief on that score. But, unless and until abandonment is authorized, failure to operate over the branches would be a violation of the Interstate Commerce Act.

In these circumstances, the willingness of the State of New York to make an outright grant of up to $850,000 for the necessary capital improvements is, understandably, regarded by the proponents of this proposal as an extremely favorable development. Not only would this make it possible for the Debtor to carry out its existing legal responsibility to operate trains over these branches, but the lines would be put in such condition that maintenance expenses on the branches would be substantially reduced over the next few years. On the other hand, the creditors who oppose the transaction are undoubtedly correct in asserting that this approach does not really represent a solution to the overall problems of unprofitable branch lines. From their standpoint, the $850,000 contribution from the State would add very little if anything to the liquidation value of the Debtor's estate, and would merely make it more likely that the Debtor would continue loss operations over the branches during the next eight years.

 I accept the creditors' arguments as basically sound, but I have nevertheless concluded that the present application should be approved. It represents at least a temporary, stop-gap solution in the case of these two branches, where the immediate crisis requires an immediate solution. Choices between subsidized operations and abandonments should be made in the context of the Regional Rail Reorganization Act of 1973, assuming that Act or some reasonable facsimile remains in effect when all of the pending litigation on that subject has been concluded. At the very least, this Court should not now take any action which would interfere with the development of a Final System Plan pursuant to that statute, unless clearly mandated by constitutional considerations. Under the terms of the agreement now proposed, the Trustee would not be required to continue operations over the branch lines if prevented by circumstances beyond his control; and it is clear on the record that a cessation or liquidation order by this Court would be such a circumstance. In short, under this agreement, the Trustee would not be waiving any constitutional rights. He would merely be agreeing not to pursue abandonment proceedings with respect to these two branches during the next eight years, if the railroad continues to function that long.

The objecting creditors have expressed concern that the actual cost of upgrading the two branches may exceed the $850,000 allocated by NYDOT. However, the evidence establishes that the work will not cost that much, and that the Trustee's estimates include appropriate allowances for inflationary trends. In fact, to a considerable extent, approval of the present petition would amount to authorizing the Trustee to recoup sums which have already been spent.

In summary, the present transaction would be in the public interest, might benefit the Debtor's estate and, at least, would probably not be harmful to the Debtor's estate. During such period as continued operation of the Debtor's railroad as a whole may be constitutionally permissible, it is unlikely that continued operations over these two branch lines pursuant to this agreement would do violence to constitutional rights.